# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, IN HER CAPACITY AS RECEIVER FOR ARTHUR LAMAR ADAMS AND MADISON TIMBER PROPERTIES, LLC, | Case No. 3:19-cv-_364_-CWR-FKB |
| Plaintiff, | Arising out of Case No. 3:18-cv-252, *Securities and Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC* |
| v. | Hon. Carlton W. Reeves, District Judge |
| THE UPS STORE, INC.; HERRING VENTURES, LLC d/b/a THE UPS STORE; AUSTIN ELSEN; TAMMIE ELSEN; COURTNEY HERRING; DIANE LOFTON; and CHANDLER WESTOVER, | |
| Defendants. | |

## COMPLAINT

## * * * TRIAL BY JURY DEMANDED * * *

Alysson Mills, in her capacity as the court-appointed receiver for Arthur Lamar Adams and Madison Timber Properties, LLC (the "Receiver"), through undersigned counsel, files this Complaint against The UPS Store, Inc.; Herring Ventures, LLC d/b/a The UPS Store; Austin Elsen; Tammie Elsen; Courtney Herring; Diane Lofton; and Chandler Westover (collectively "Defendants"), stating as follows:

## INTRODUCTION

For more than ten years, Arthur Lamar Adams ("Adams"), through his companies Madison Timber Company, Inc. and Madison Timber Properties, LLC ("Madison Timber"), operated a Ponzi scheme that defrauded hundreds of investors. Investors believed that Madison Timber used investors' money to purchase timber from Mississippi landowners; that Madison Timber sold the timber to Mississippi lumber mills at a higher price; and that Madison Timber repaid investors their principal plus interest with the proceeds of those sales. Investors received timber deeds that purported to secure their investments—but the deeds were fake. There was no timber and no proceeds from sales of timber. The money used to repay existing investors came solely from new investors.

Madison Timber had to continuously grow to repay existing and new investors, and continuously grow it did. In 2011, Madison Timber took in approximately $10 million from investors. By 2018 that number had grown by a factor of 16. In the one-year period prior to April 19, 2018, the date Adams surrendered to federal authorities and confessed to the Ponzi scheme, Madison Timber took in approximately $164.5 million. As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[1]

Defendants are the notaries and their employer on whom Adams principally relied to notarize fake timber deeds for thousands of investments. Defendants attested that landowners signed the deeds—but those attestations were knowingly false. In many instances, the landowners did not exist; in all instances, Adams forged the signatures. Defendants effectively made their place of employment a fake timber deed factory. Because they contributed to the success of the Madison Timber Ponzi scheme, they are liable for the debts of the Receivership Estate to investors.

---

[1] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference. The outstanding principal and interest owed to investors is necessarily higher.

## JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action and its parties, and venue is proper in this Court, pursuant to the Securities Act of 1933, 15 U.S.C. § 77v(a); the Securities & Exchange Act of 1934, 15 U.S.C. § 78aa; 28 U.S.C. § 1692; and 28 U.S.C. § 754.

2.     This action arises in connection with and is ancillary to the civil action already pending in this Court styled *Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB.  In that civil action, the Securities & Exchange Commission ("S.E.C.") alleges that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme" in violation of the Securities Act of 1933 and the Securities & Exchange Act of 1934.[2]

3.     The S.E.C. requested that the Court appoint a receiver for the estates of Adams and Madison Timber.[3]  As the Court that appointed the Receiver, this Court has jurisdiction over any claim brought by the Receiver in the execution of her duties. "[I]t is well-settled that when an initial suit results in the appointment of the receiver, any suit that the receiver thereafter brings in the appointment court in order to execute h[er] duties is ancillary to the main suit." *U.S. Small Bus. Admin. v. Integrated Envtl. Sols., Inc.*, No. 05-cv-3041, 2006 WL 2336446, at *2 (S.D. Tex. Aug. 10, 2006) (citing *Haile v. Henderson Nat'l Bank*, 657 F.2d 816, 822 (6th Cir. 1981)).  *See also* 28 U.S.C. § 1692 ("In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed, situated in different districts, process may issue and be executed in any such district as if the property lay wholly within one district . . . .").

4.     Consistent with that precedent, Chief U.S. District Judge Daniel P. Jordan III has ordered that all "cases filed by the duly appointed Receiver . . . which . . . arise out of or relate to

---

[2] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).
[3] Docs. 11, 21, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

[*Securities & Exchange Commission v. Arthur Lamar Adams and Madison Timber Properties, LLC*, No. 3:18-cv-252-CWR-FKB] shall be directly assigned by the Clerk of Court to U.S. District Judge Carlton W. Reeves and U.S. Magistrate Judge F. Keith Ball."[4]  In compliance with Chief Judge Jordan's order, the Receiver shall separately file, contemporaneously with this complaint, a notice of relatedness.

## PARTIES

5.     Plaintiff Alysson Mills is the Court-appointed Receiver for the estates of Adams and Madison Timber.  The Court's order of appointment vests in her the power to, among other things:

> investigate and . . . bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging her duties as Receiver.[5]

The Receiver brings this civil action in her capacity as Receiver and pursuant to the powers vested in her by the Court's orders and applicable law.  The Receiver has standing to pursue, *inter alia*, claims against third parties whose actions contributed to the success of the Madison Timber Ponzi scheme, and therefore to the debts of the Receivership Estate.

6.     Defendant The UPS Store, Inc. (with The UPS Store Madison, "UPS") is a Delaware corporation doing business in Mississippi.

7.     Defendant Herring Ventures, LLC d/b/a The UPS Store ("The UPS Store Madison"; with The UPS Store, Inc., "UPS") is a Mississippi limited liability company doing business in Mississippi.

---

[4] Doc. 45, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

[5] Doc. 33, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss). By order dated August 22, 2018, the Court eliminated the requirement that the Receiver obtain "prior approval of this Court upon ex parte request" before bringing any legal action.  Doc. 38, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

8.     Defendant Austin Elsen is an adult resident of Madison, Mississippi.   At all relevant times Austin Elsen was an employee of UPS (with other employees of UPS, the "UPS employees").

9.     Defendant Tammie Elsen is an adult resident of Madison, Mississippi.   At all relevant times Tammie Elsen was an employee of UPS (with other employees of UPS, the "UPS employees").

10.     Defendant Courtney Herring is an adult resident of Raymond, Mississippi.  At all relevant times Courtney Herring was an employee of UPS (with other employees of UPS, the "UPS employees").

11.     Defendant Diane Lofton is an adult resident of Ridgeland, Mississippi.   At all relevant times Diane Lofton was an employee of UPS (with other employees of UPS, the "UPS employees").

12.     Defendant Chandler Westover is an adult resident of Clinton, Mississippi.  At all relevant times Chandler Westover was an employee of UPS (with other employees of UPS, the "UPS employees").

## MADISON TIMBER

13.     For more than ten years, Lamar Adams, through Madison Timber, operated a Ponzi scheme that purported to purchase timber from Mississippi landowners and resell it to Mississippi lumber mills at higher prices.

14.     Investors delivered to Madison Timber large sums of money, typically in excess of $100,000 dollars, in reliance on the promise that Madison Timber would repay them their principal plus interest of not less than 12% per annum, and sometimes as much as 20% per annum.  The

promised interest invariably far exceeded the interest any investor might receive on any other asset-backed investment.

15.     Investors were told by Adams or other persons associated with Madison Timber that Madison Timber would use their money to acquire timber deeds and cutting agreements from Mississippi landowners; that Madison Timber would then sell the timber to Mississippi lumber mills at a higher price; and that with the proceeds of those sales Madison Timber would repay investors their principal and promised interest.

16.     In exchange for their investments, investors in the Madison Timber Ponzi scheme received a promissory note in the amount of their investment, payable in twelve monthly installments together with the promised interest; twelve pre-dated checks, each in the amount of the installment due under the promissory note; a notarized timber deed and cutting agreement by which a named landowner purported to grant to Madison Timber the rights to harvest timber on the land described in the deed; and a timber deed and cutting agreement by which Madison Timber purported to grant its own rights to the investor.

17.     In fact, the timber deeds and cutting agreements were fake.  Madison Timber had no rights to harvest timber and no timber to cut and sell.  Because Madison Timber had no revenues whatsoever, investors were being repaid with new investors' money.

18.     Each month, Madison Timber required more and more new investors to repay existing investors.  Like any Ponzi scheme, Madison Timber had to continuously grow.  To grow Madison Timber, Adams relied on recruiters, including Defendants, to attract new investors.

19.     In 2011, Madison Timber took in approximately $10 million from investors.  By 2018 that number had grown by a factor of 16.

20.     On April 19, 2018, on the heels of investigations of him by the F.B.I. and the U.S. Attorney's Office for the Southern District of Mississippi, Adams turned himself in. In the one-year period prior to April 19, 2018, Madison Timber took in approximately $164.5 million. As of April 19, 2018, Madison Timber had 501 outstanding promissory notes, reflecting debts to investors of more than $85 million.[6]

21.     Adams pleaded guilty to the federal crime of wire fraud and "admit[ted] to all of the conduct of the entire scheme and artifice to defraud."[7]  On October 30, 2018, he was sentenced to a term of imprisonment of 235 months.[8]

22.     The S.E.C. separately charged Adams with violations of the Securities Act of 1933 and Securities & Exchange Act of 1934, alleging in its complaint that "[b]eginning in approximately 2004," Adams, through Madison Timber, "committed securities fraud by operating a Ponzi scheme."[9]

23.     The promissory notes sold by Madison Timber to investors were "securities," as that term is defined under 15 U.S.C.A. §78(c)(A)(10) and Miss. Code Ann. § 75-71-102(28).

24.     As alleged in the complaint in the underlying action *S.E.C. v. Arthur Lamar Adams et al.*, No. 3:18-cv-252 (S.D. Miss.), and in the bill of information filed against Adams in *U.S. v. Arthur Lamar Adams*, No. 3:18-cr-188 (S.D. Miss.), Adams, Madison Timber, and their affiliates, including Defendants, facilitated sales of promissory notes to investors through material misstatements and omissions; employed a device, scheme, or artifice to defraud; and engaged in acts, practices, or courses of business that operated or would operate as a fraud or deceit, all in

---

[6] The evidence at Adams's sentencing established that of the $164.5 million that Madison Timber received in its last year of operation, it paid back approximately $79.5 million, leaving an $85 million difference.  The outstanding principal and interest owed to investors is necessarily higher.

[7] Doc. 11, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss).

[8] Doc. 21, United States v. Adams, No. 3:18-cr-00088 (S.D. Miss).

[9] Doc. 3, Securities & Exchange Commission vs. Adams, et al., No. 3:18-cv-00252 (S.D. Miss).

violation of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(A); Section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5,

thereunder; as well as the Mississippi Securities Act, Miss. Code Ann. § 75-71-501.

25.     The sales furthermore violated the Securities Act of 1933 and the Mississippi

Securities Act because there were no registration statements for the promissory notes, *see* Section

5 of the Securities Act of 1933, 15 U.S.C § 77e, and Miss. Code Ann. § 75-71-301; and the

promissory notes were not exempt from registration, *see* Section 5 of the Securities Act of 1933,

15 U.S.C § 77e, and Miss. Code Ann. §§ 75-71-201 through 75-71-203.

## NOTARIES

26.     Defendants enabled the Madison Timber Ponzi scheme by notarizing the fake

timber deeds that each investor received in exchange for his or her investment. The deeds

purported to grant to Madison Timber the rights to harvest timber on the land described, which

Madison Timber in turn purported to transfer to investors.

27.     The timber deeds appeared to have been signed by the landowner, as grantor, and

Lamar Adams for Madison Timber, as grantee. Below the two signatures, a notary attested to the

signatures' authenticity and affixed his or her notarial seal. The following is representative of

Defendants' attestations:

Dated: 4/12/18 ,2018          Madison Timber Properties, LLC
John L. Black

BY: John L. Black

GRANTOR          GRANTEE

STATE OF MISSISSIPPI
COUNTY OF Madison
The foregoing PERSONALLY appeared before me, the undersigned notary public for the
jurisdiction aforesaid on the 12 day of April , 2018, the within named two, who
acknowledged that they signed, executed and delivered the above foregoing instrument, after first
having been duly authorized to do so.

My Commission Expires: May 6, 2018          Tammie Elsen
                                             NOTARY PUBLIC

28.     But Defendants' attestations were false. The grantors-landowners never "personally appeared" before Defendants. In many instances, the grantors-landowners did not exist. In all instances, the grantors-landowners' signatures were forged by Adams.

29.     The grantor-landowner was the most important party to the timber deed, and his or her signature is the document's most important mark. Without the grantor-landowner's signature, the rights to harvest timber on the land described would be unenforceable.

30.     On information and belief, sometimes Adams forged the grantors-landowners' signatures before he presented the timber deeds to Defendants, such that it appeared that he or she had already signed. Other times Adams presented the deeds with a blank where the grantor-landowner would sign, such that it appeared that he or she would sign later. At no time, however, did any grantor-landowner sign the documents in Defendants' presence.

31.     Over the course of the Madison Timber Ponzi scheme, Adams fabricated fake timber deeds for thousands of investments—501 in the last year of Madison Timber's operations.

32.     A precise accounting of the number of fake timber deeds carelessly and fraudulently notarized by Defendants is impossible. Adams instructed investors to return the deeds to Madison Timber when their promissory notes had been paid in full. Adams did not maintain records of who returned the deeds and when. For any returned deeds that he kept, he stacked them in a closet in Madison Timber's office.

33.     The fake timber deeds that have been recovered nevertheless confirm that Defendants are the notaries and their employer on whom Adams principally relied. Defendants effectively made their place of employment a fake timber deed factory.

**Defendants' duties**

34.     A notary public, or notary, is a person commissioned to perform official acts under the laws of the State of Mississippi.  1 Miss. Admin. Code Pt. 5, R. 1.14.

35.     "Notaries are intrusted with high and important functions. Their certificates are made authentic evidence of titles by which we hold our lands, and by which they pass from one to another, and which endure from generation to generation." *U. S. Fid. & Guar. Co. v. State, for Use of Ward*, 211 Miss. 864, 874, 53 So. 2d 11, 14 (Miss. 1951).  "Their responsibility is as high as their trust . . . ." *Id.* (citation omitted).

36.     Mississippi law required Defendants to perform the duties of their office with care and in compliance with rules that govern notaries in this state.

37.     The Mississippi Notary Law empowers the Mississippi Secretary of State to prescribe rules that govern notaries in this state.  Those rules, at 1 Miss. Admin. Code Pt. 5, R. 1.1

*et seq.*, provide that a notary has a duty to examine a document "to establish that the requested notarization is appropriate."[10]

38.     Rule 5.1 expressly prohibits a notary from notarizing the signature of a party who is not present: "A notary shall not perform a notarial act if the principal . . . is not in the notary's presence at the time of notarization."[11]

39.     Rule 5.6 expressly prohibits a notary from notarizing a document for which a signature is blank: "A notary shall not notarize a signature . . . on a blank or incomplete document."

40.     Rule 5.7 expressly prohibits a notary from using his or her office to defraud: "A notary shall not perform any official action with the intent to deceive or defraud."

41.     Rule 5.15 mandates that every notary in this state maintain "a chronological official journal of notarial acts."[12]  "For every notarial act, the notary shall record in the journal at the time of notarization at least the following: 1. the date and time of day of the notarial act; 2. the type of notarial act; 3. the type, title, or a description of the document or proceeding; 4. the printed name and address of each principal; 5. the fee, if any, charged for the notarial act; [and] 6. the address where the notarization was performed if not the notary's business address." R. 5.16.

42.     "[A] notary's performance of any act prohibited, or failure to perform any act mandated," constitutes "official misconduct," "misfeasance," and "malfeasance."  R. 1.16.

---

[10] R. 5.6 ("It is therefore, the duty of the notary to examine [a] document, as may be necessary to establish that the requested notarization is appropriate and not contrary to public interest.").

[11] "'Principal' means . . . a person whose signature is notarized." R. 1.19. "'Notarial act' and 'notarization' mean any act that a notary is empowered to perform under law or regulation." R. 1.12.

[12] *See also* Miss. Code Ann. § 25-33-5 ("Every notary public shall keep a fair register of all his official acts, and shall give a certified copy of his record, or any part thereof, to any person applying for it and paying the legal fees therefor.").

**Defendants' careless and fraudulent acts**

43.     "Where a notary is called on [to] perform an act which he is authorized by law to perform, and he does so carelessly or fraudulently, he and his surety are liable for any loss proximately resulting therefrom." *U. S. Fid. & Guar. Co.*, 211 Miss. at 877, 53 So. 2d at 16.

44.     Defendants did not examine the timber deeds to establish that the requested notarizations were appropriate, in direct violation of Rule 5.6.

45.     Defendants notarized the signatures of purported grantors-landowners who were not present, in direct violation of Rule 5.1.

46.     Defendants notarized timber deeds for which the grantors-landowners' signatures were blank, in direct violation of Rule 5.6

47.     Given the volume of timber deeds Adams presented to Defendants without the grantors-landowners present, Defendants knew or should have known that the deeds were fake. Defendants were complicit in Adams's intent to defraud, in direct violation of Rule 5.7.

48.     Defendants knew or should have known that their attestations were false because Defendants knew, at a minimum, that the purported grantors-landowners never "personally appeared" before them. "[A] notary who officially certifies as true what he knows to be false violates his duty, commits a crime, . . . binds himself, and binds his sureties." *U. S. Fid. & Guar. Co.*, 211 Miss. at 874, 53 So. 2d at 14 (citation omitted).

49.     At a minimum, Defendants acted recklessly in violating these statutory, regulatory, and other legal duties.

**UPS**

**The UPS Store, Inc.**

50.     The UPS Store, Inc. is the world's largest franchisor of retail shipping, postal, printing, and business service centers, with more than 4,600 locations in the U.S., Puerto Rico, and Canada. It boasts that it has been the "#1 Postal & Business Services Franchise for 29 Consecutive Years."

51.     The UPS Store, Inc. holds itself out to the public as offering "business service solutions and impeccable customer support." Its website represents: "The UPS Store is about a lot more than shipping, we help our customers with services like faxing, notarizing, copying, shredding, business and personal mailboxes, packing, passport and ID photos, design and a host of small business services."

52.     The UPS Store, Inc. controls every aspect of its stores' business, including their provision of notary services. The UPS Store, Inc. dictates the location and designs of its stores, the signage they may use, the merchandise they sell, the services they offer, and the manner in which they conduct their business.

53.     To ensure that all of its stores conform to its "strong brand," The UPS Store, Inc. provides each of its stores with "a comprehensive training program," "ongoing support," and "advertising and marketing campaigns." Its website explains that The UPS Store, Inc. provides "everything you need to open for business":

> When you decide to open a The UPS Store franchise, we provide everything you need to open for business. We'll assist with helping you find and secure a retail location, plan and build out your store, work with local contractors to procure permits and bids, and order and install equipment and computers.

* * *

We've had over 35 years to establish a strong brand, but we're never finished. Our corporate office continues to increase brand awareness across the country with millions of dollars in ongoing national advertisements and marketing campaigns, including television, digital, print, and radio.

We also invest in regional and local advertising campaigns to help those in your community get to know you. Our commitment to brand awareness gives you one less thing to focus on so you can put your strengths and budget into your business operations.

54.     "Notary Services" are among The UPS Store, Inc.'s most advertised business services.  It website devotes a full page to "Notary Services," explaining that "[c]ertain documents must be notarized in order to have legal effect" and "The UPS Store locations offer notary services to help make life easier":

The UPS store locations offer notary services to help make life easier. Once your documents are notarized, the center will help you make any necessary copies and ship them where they need to go.

Why do documents need to be notarized?
Certain documents must be notarized in order to have legal effect. Given the inherent formal and corresponding significance of this subject of legal documents that must be notarized, state governments have deemed it necessary to enlist a trained individual to assist with their execution. A "notary public," following his or her official appointment , a notary public performs as a quasi-public officer to attest to the proper execution of these important documents.

Types of documents that may require notarization:
Wills
Trusts
Deeds
Contracts
Affidavits

**The UPS Store Madison**

55.     The UPS Store Madison is a franchisee of The UPS Store, Inc.

56.     Consistent with The UPS Store, Inc.'s dictates and brand, The UPS Store Madison prominently advertises its "Notary Services."  A large sign in The UPS Store Madison's window states:

**We Print**

**SHIPPING**
**Ship without the stress**

**NOTARY**
**We're here to help**

**SHREDDING**
**Disposal of documents**

A large sign inside The UPS Store Madison features a picture of a notary's stamp and seal and states:

**NOTARY SERVICES**
**Licensed pros are here.**

**UPS employees**

57.     The UPS Store Madison employed persons (the "UPS employees") to provide business services, including notary services, to customers, consistent with The UPS Store, Inc.'s dictates and brand.

58.     Adams was a customer of The UPS Store Madison. The UPS employees provided notary services to Adams in the course and scope of their employment—that is, they provided notary services in furtherance of The UPS Store, Inc.'s and The UPS Store Madison's business.

59.     The UPS employees notarized fake timber deeds for Adams. A representative example for each is attached as **Exhibit A**.

60.     On information and belief, Adams routinely presented the UPS employees with stacks of timber deeds to notarize—and they did so, without examining the deeds to establish that the requested notarizations were appropriate, in direct violation of Rule 5.6.

61.     Given the volume of timber deeds Adams presented to the UPS employees without the grantors-landowners present, the UPS employees knew or should have known that the deeds were fake. The UPS employees were complicit in Adams's intent to defraud, in direct violation of Rule 5.7.

62.     The UPS employees notarized the signatures of purported grantors-landowners who were not present, in direct violation of Rule 5.1, and notarized timber deeds for which the grantors-landowners' signatures were blank, in direct violation of Rule 5.6.  The UPS employees attested that the grantors-landowners "personally appeared" before them—but because no grantor-landowner ever "personally appeared," the UPS employees knew their attestations were false.

63.     The UPS employees did not enter in "a chronological official journal of notarial acts" the notarial acts that they performed for Adams, in direct violation of Rules 5.15 and 5.16. On information and belief, The UPS employees maintained an official journal but altogether ceased entering the notarial acts that they performed for Adams when it became too cumbersome.

## CAUSES OF ACTION

## COUNT I
## FOR CIVIL CONSPIRACY
## AGAINST ALL DEFENDANTS

64.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

65.     Mississippi law defines a civil conspiracy as a "combination of persons for the purpose of accomplishing an unlawful purpose or a lawful purpose unlawfully." *Shaw v. Burchfield*, 481 So. 2d 247, 255 (Miss. 1985).

66.     Defendants conspired with Adams to commit the tortious acts alleged in this complaint.

67.     Defendants agreed to assist Adams by notarizing fake timber deeds that investors received in exchange for their investments in Madison Timber.

68.     Madison Timber was a Ponzi scheme. Defendants and Adams's purpose was therefore unlawful.

69.     In addition, Defendants acted unlawfully. "[A] notary's performance of any act prohibited, or failure to perform any act mandated," constitutes "official misconduct," "misfeasance," and "malfeasance."  R. 1.16. Defendants failed to examine the timber deeds to establish that the requested notarizations were appropriate, in direct violation of Rule 5.6; notarized the signatures of purported grantors-landowners who were not present, in direct violation of Rule 5.1; notarized deeds for which the grantors-landowners' signatures were blank, in direct violation of Rule 5.6; and did not enter in "a chronological official journal of notarial acts" the notarial acts that they performed for Adams, in direct violation of Rules 5.15 and 5.16.

70.     Defendants knew or should have known that the timber deeds were fake, given the volume of deeds Adams presented to Defendants without the grantors-landowners present. Defendants were complicit in Adams's intent to defraud, in direct violation of Rule 5.7.

71.     Defendants knew their attestations were false because Defendants knew, at a minimum, that the purported grantors-landowners never "personally appeared" before them. "[A] notary who officially certifies as true what he knows to be false violates his duty, commits a crime, . . . binds himself, and binds his sureties." *U. S. Fid. & Guar. Co.*, 211 Miss. at 874, 53 So. 2d at 14 (citation omitted).

72.     Defendants were essential to the growth of the Madison Timber Ponzi scheme. Defendants legitimized the fake timber deeds on which Madison Timber relied to recruit new investors.  But for Defendants' careless and fraudulent notarial acts, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

73.     Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' careless and fraudulent notarial acts are a proximate cause of the debts of the Receivership Estate.

74.     Defendants are jointly and severally liable for the debts of the Receivership Estate, which their and Adams's civil conspiracy proximately caused.

75.     Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

## COUNT II
## FOR AIDING AND ABETTING
## AGAINST ALL DEFENDANTS

76.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

77.     The Restatement (Second) of Torts § 876(b) (1979) provides that a defendant is liable if he "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  Stated differently, a defendant is liable for aiding and abetting the wrongful conduct of another.

78.     Defendants aided and abetted Adams by notarizing fake timber deeds that investors received in exchange for their investments in Madison Timber.

79.     Defendants acted unlawfully. "[A] notary's performance of any act prohibited, or failure to perform any act mandated," constitutes "official misconduct," "misfeasance," and "malfeasance."  R. 1.16. Defendants failed to examine the timber deeds to establish that the requested notarizations were appropriate, in direct violation of Rule 5.6; notarized the signatures of purported grantors-landowners who were not present, in direct violation of Rule 5.1; notarized deeds for which the grantors-landowners' signatures were blank, in direct violation of Rule 5.6; and did not enter in "a chronological official journal of notarial acts" the notarial acts that they performed for Adams, in direct violation of Rules 5.15 and 5.16.

80.     Defendants knew or should have known that the timber deeds were fake, given the volume of deeds Adams presented to Defendants without the grantors-landowners present. Defendants were complicit in Adams's intent to defraud, in direct violation of Rule 5.7.

81.     Defendants knew their attestations were false because Defendants knew, at a minimum, that the purported grantors-landowners never "personally appeared" before them. "[A]

notary who officially certifies as true what he knows to be false violates his duty, commits a crime, . . . binds himself, and binds his sureties." *U. S. Fid. & Guar. Co.*, 211 Miss. at 874, 53 So. 2d at 14 (citation omitted).

82.     Defendants were essential to the growth of the Madison Timber Ponzi scheme. Defendants legitimized the fake timber deeds on which Madison Timber relied to recruit new investors.  But for Defendants' careless and fraudulent notarial acts, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new and unwitting investors.

83.     Defendants contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' careless and fraudulent notarial acts are a proximate cause of the debts of the Receivership Estate.

84.     Defendants are jointly and severally liable for the debts of the Receivership Estate, which their substantial assistance and encouragement proximately caused.

85.     Because Defendants acted with reckless disregard of the wellbeing of others, and in specific instances described in this complaint committed actual fraud, punitive damages are appropriate.

## COUNT III
## FOR RECKLESSNESS, GROSS NEGLIGENCE, AND AT A MINIMUM NEGLIGENCE AGAINST ALL DEFENDANTS

86.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

87.     "Negligence is a failure to do what the reasonable person would do under the same or similar circumstances." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).

88.    While negligence is the failure to exercise due care, recklessness "is a failure or refusal to exercise any care." *Maldonado v. Kelly*, 768 So. 2d 906, 910 (Miss. 2000).

89.    Defendants not only failed to exercise due care, they failed or refused to exercise any care at all in their dealings with Adams.

90.    "[A] notary's performance of any act prohibited, or failure to perform any act mandated," constitutes "official misconduct," "misfeasance," and "malfeasance." R. 1.16. "Where a notary is called on [to] perform an act which he is authorized by law to perform, and he does so carelessly or fraudulently, he and his surety are liable for any loss proximately resulting therefrom." *U. S. Fid. & Guar. Co.,* 211 Miss. at 877, 53 So. 2d at 16.

91.    Defendants failed to examine the timber deeds to establish that the requested notarizations were appropriate, in direct violation of Rule 5.6; notarized the signatures of purported grantors-landowners who were not present, in direct violation of Rule 5.1; notarized deeds for which the grantors-landowners' signatures were blank, in direct violation of Rule 5.6; and did not enter in "a chronological official journal of notarial acts" the notarial acts that they performed for Adams, in direct violation of Rules 5.15 and 5.16.

92.    Defendants knew or should have known that the timber deeds were fake, given the volume of deeds Adams presented to Defendants without the grantors-landowners present. Defendants were complicit in Adams's intent to defraud, in direct violation of Rule 5.7.

93.    Defendants knew their attestations were false because Defendants knew, at a minimum, that the purported grantors-landowners never "personally appeared" before them. "[A] notary who officially certifies as true what he knows to be false violates his duty, commits a crime, . . . binds himself, and binds his sureties." *U. S. Fid. & Guar. Co.*, 211 Miss. at 874, 53 So. 2d at 14 (citation omitted).

94.     Defendants' recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow.   Madison Timber grew from an approximately $10 million-a-year Ponzi scheme in 2011 to an approximately $164.5 million-a-year Ponzi scheme as of April 19, 2018.

95.     But for Defendants' recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

96.     Defendants by their recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership Estate's liabilities today. Defendants' recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

97.     Defendants are liable for the debts of the Receivership Estate, which their recklessness, or at a minimum negligence, proximately caused.

98.     Because Defendants acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

## COUNT IV
## FOR NEGLIGENT RETENTION AND SUPERVISION
## AGAINST THE UPS STORE MADISON

99.     The Receiver re-alleges each of the foregoing paragraphs as though stated fully herein.

100.     "[A]n employer will be liable for negligent hiring or retention of his employee when an employee injures a third party if the employer knew or should have known of the employee's incompetence or unfitness." *Backstrom v. Briar Hill Baptist Church, Inc.*, 184 So. 3d 323, 327 (Miss. Ct. App. 2016).

101.    Employees of Defendant The UPS Store Madison assisted Adams by notarizing fake timber deeds for thousands of investments, effectively making its place of employment a fake timber deed factory. Given the volume of timber deeds Adams presented to its employees without the grantors-landowners present, Defendant The UPS Store Madison knew or should have known that its employees were carelessly and fraudulently legitimizing fake deeds.

102.    Defendant The UPS Store Madison knew or should have known that its employees did not follow rules governing notaries in this state. Specifically, Defendant The UPS Store Madison knew or should have known that its employees did not enter into "a chronological official journal of notarial acts" the notarial acts that they performed for Adams, in direct violation of Rules 5.15 and 5.16.

103.    Defendant The UPS Store Madison knew or should have known of its employees' incompetence or unfitness.

104.    Defendant The UPS Store Madison was reckless, or at a minimum negligent, in retaining its employees and failing to supervise its employees' dealings.

105.    Defendant The UPS Store Madison's recklessness, or at a minimum negligence, allowed Madison Timber to continuously grow.  Madison Timber grew from an approximately $10 million Ponzi scheme in 2011 to an approximately $164.5 million Ponzi scheme on April 19, 2018.

106.    But for Defendant The UPS Store Madison's recklessness, or at a minimum negligence, Madison Timber would not have continuously grown—it would have failed before ensnaring hundreds of new unwitting investors.

107.    Defendant The UPS Store Madison, by its recklessness, or at a minimum negligence, contributed to Madison Timber's success over time, and therefore to the Receivership

Estate's liabilities today. Its recklessness, or at a minimum negligence, is a proximate cause of the debts of the Receivership Estate.

108.    Defendant The UPS Store Madison is liable for the debts of the Receivership Estate, which its recklessness, or at a minimum negligence, proximately caused.

109.    Because Defendant The UPS Store Madison acted with gross negligence evincing a reckless disregard of the wellbeing of others, punitive damages are appropriate.

## THE UPS STORE, INC.'S LIABILITY

110.    Defendant The UPS Store, Inc. is liable for the acts of The UPS Store Madison and the UPS employees because Defendant The UPS Store, Inc. controls every aspect of its stores' business, including their provision of notary services. The UPS Store, Inc. dictates the location and designs of its stores, the services they offer, the merchandise they sell, the manner in which they conduct their business, and the signage they may use. The UPS Store, Inc. holds itself out to the public as the entity the public does business with.  Relevant here, The UPS Store, Inc. specifically advertises that its stores nationwide offer notary services "to make life easier."

111.    The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant The UPS Store, Inc. is liable for payment of all damages or other relief awarded in favor of the Receiver and against The UPS Store Madison and its UPS employees.

## THE UPS STORE MADISON'S VICARIOUS LIABILITY

112.    The UPS Store Madison employed the UPS employees to provide business services, including notary services, to customers. The UPS employees provided notary services to Adams in the course and scope of their employment—that is, they provided notary services in furtherance of The UPS Store Madison's business. Defendant The UPS Store Madison is liable for the negligent and reckless acts of its agents, the UPS employees.

24

113.    The Receiver is entitled to a declaratory judgment holding, *inter alia*, that Defendant The UPS Store Madison is liable for payment of all damages or other relief awarded in favor of the Receiver and against the UPS employees.

———————————

WHEREFORE, the Receiver respectfully requests that, after due proceedings, including a trial by jury, the Court enter judgments:

1. awarding damages, including punitive damages, in her favor and against The UPS Store, Inc.; Herring Ventures, LLC d/b/a The UPS Store; Austin Elsen; Tammie Elsen; Courtney Herring; Diane Lofton; and Chandler Westover, jointly and severally;

2. awarding any and all attorney's fees, costs, and interest allowed by contract or law; and

3. awarding any and all other relief as may be just and equitable.

May 23, 2019

Respectfully submitted,

*/s/  Lilli Evans Bass*

BROWN BASS & JETER, PLLC
Lilli Evans Bass, Miss. Bar No. 102896
LaToya T. Jeter, Miss. Bar No. 102213
1755 Lelia Drive, Suite 400
Jackson, Mississippi 39216
Tel: 601-487-8448
Fax: 601-510-9934
bass@bbjlawyers.com
*Receiver's counsel*

*/s/ Brent B. Barriere*

FISHMAN HAYGOOD, LLP
*Admission pro hac vice pending*
Brent B. Barriere, *Primary Counsel*
Jason W. Burge
Kristen D. Amond
Rebekka C. Veith
201 St. Charles Avenue, Suite 4600
New Orleans, Louisiana 70170
Tel: 504-586-5253
Fax: 504-586-5250
bbarriere@fishmanhaygood.com
jburge@fishmanhaygood.com
kamond@fishmanhaygood.com
rveith@fishmanhaygood.com
*Receiver's counsel*