IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| ALYSSON MILLS, *in her Capacity as Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC* | PLAINTIFF |
| v. | Civil Case No. 3:19-cv-00364-CWR-BWR |
| THE UPS STORE, INC.; HERRING VENTURES, LLC, *d/b/a The UPS Store*; AUSTIN ELSEN; TAMMIE ELSEN; COURTNEY HERRING; DIANE LOFTON; CHANDLER WESTOVER; and AMERICAN CASUALTY COMPANY OF READING PA | DEFENDANTS |

### MEMORANDUM OPINION AND ORDER GRANTING TUPSS'S MOTION FOR INVESTOR DISCOVERY

THIS MATTER is before The UPS Store, Inc.'s (TUPSS's) Motion for Investor Discovery [352] and Memorandum in Support [353]. Alysson Mills, the Court-appointed Receiver for Arthur Lamar Adams and Madison Timber Properties, LLC, has filed a Response [362] and TUPSS a Reply [366]. Having considered the matter, TUPSS's Motion to Conduct Investor Discovery [352] is granted. A discovery conference will be scheduled to determine the first group of investors to be deposed and further discuss proportionality and Receiver's objections, if any, to a questionnaire.

## I. BACKGROUND

A. <u>General History</u>

1

1.  **Arthur Lamar Adams**

From at least 2010 until April 2018, Arthur Lamar Adams (Adams) operated a Ponzi scheme through his purported timber investment companies, Madison Timber Company LLC and Madison Timber Properties LLC (collectively, Madison Timber). *Mills v. Seawright*, No. 3:20-cv-232-CWR-FKB, 2021 WL 785105, at *1 (S.D. Miss. Mar. 1, 2021). Adams pleaded guilty to wire fraud and is serving a 19.5-year sentence in federal prison. Judgment [21], *United States v. Adams,* 3:18-cr-88-CWR-FKB (S.D. Miss. Nov. 8, 2018). Adams is not a Defendant in this suit.

The transcript from Adams's plea hearing shows that Adams agreed that he, aided and abetted by others, "knowingly and intentionally devised a scheme and artifice to defraud investors by soliciting millions of dollars of funds under false pretenses, failing to use the invested funds as promised and misappropriating and converting those investors' funds to [his] own benefit and to the benefit of others without the knowledge or the consent or authorization of the investors." Tr. [14] at 25, *United States v. Adams,* 3:18-cr-88-CWR-FKB (S.D. Miss. May 23, 2018). "Adams entered into investment contracts with investors most often in the form of promissory notes on behalf of Madison Timber." *Id.* at 30-31. "The loans typically guaranteed investors an interest rate of 12 to 13 percent which was to be repaid to investors over the course of 12 to 13 months." *Id* at 31.

"Adams falsely and fraudulently represented to investors that Madison Timber Properties was in the business of buying timber rights from landowners and then selling the timber rights to lumber mills at a higher price." *Id.* at 30. "The object of

the scheme was to cause persons to invest in loans that were purportedly for the purpose of financing such contracts for the purchase of timber rights to be sold to lumber mills. In fact, neither Adams nor Madison Timber Properties had such timber rights or contracts with lumber mills except in only a few instances." *Id.* at 30. "Adams created false timber deeds purporting to be contracts conveying timber rights from landowners to Madison Timber Properties. Adams forged the signatures of landowners whose names were obtained from timber maps. Adams also created false timber deeds purporting to convey those timber rights from Madison Timber Properties to the investors. In fact, Madison Timber Properties did not hold valid timber rights on the parcels of lands described in the false timber deeds which Adams created. To further lull investors, Adams had many of the documents notarized to make the investments appear legitimate. To further conceal the scheme, Adams required the investors to agree not to record their timber deeds unless Madison Timber Properties defaulted on the loan agreement by failing to make a payment." *Id.* at 31-32.

### 2. Receiver

This case was brought by Receiver, who was appointed by the Court after the Madison Timber Ponzi scheme collapsed. Receiver is tasked with identifying and pursuing persons and entities as participants in the Ponzi scheme to recover funds for distribution to investor victims. *Seawright*, 2021 WL 785105 at *1. In this suit brought by the Receiver, the remaining Defendants are franchisor TUPSS; franchisee Herring Ventures, LLC d/b/a The UPS Store (Herring Ventures); American Casualty

Company of Reading PA; and five individual notaries public who worked at Herring Ventures: Austin Elsen, Tammie Elsen, Courtney Herring, Diane Lofton, and Chandler Westover.

### 3. Notary Defendants

The Amended Complaint alleges against TUPSS, Herring Ventures, and the individual notaries (collectively referred to as Notary Defendants) as follows: "Defendants enabled the Madison Timber Ponzi scheme by notarizing the fake timber deeds that each investor received in exchange for his or her investment." Am. Compl. [14] at ¶29. "The timber deeds appeared to have been signed by the landowner, as grantor, and Lamar Adams for Madison Timber, as grantee. Below the two signatures, a notary attested to the signatures' authenticity and affixed his or her notarial seal." *Id.* at ¶ 30. "But Defendants' attestations were false. The grantors-landowners never 'personally appeared' before Defendants. In many instances, the grantors-landowners did not exist. In all instances, the grantors-landowners' signatures were forged by Adams." *Id.* at ¶ 31. "[S]ometimes Adams forged the grantors-landowners' signatures before he presented the timber deeds to Defendants, such that it appeared that he or she had already signed. Other times Adams presented the deeds with a blank where the grantor-landowner would sign, such that it appeared that he or she would sign later. At no time, however, did any grantor-landowner sign the documents in Defendants' presence." *Id.* at ¶ 33. "Given the volume of timber deeds Adams presented to Defendants without the grantors-landowners present, Defendants knew or should have known that the deeds were

fake." *Id.* at ¶ 50. The individual notaries "attested that the grantors-landowners 'personally appeared' before them—but because no grantor-landowner ever 'personally appeared,' the UPS employees knew their attestations were false." *Id.* at ¶ 65.

The claims alleged against movant TUPSS are the following Mississippi state law claims: civil conspiracy (Count I), aiding and abetting (Count II); and "recklessness, gross negligence, and at a minimum negligence" (Count III). Receiver also seeks a declaratory judgment that TUPSS is liable for the acts of the franchisee, Herring Ventures, and the individual notaries who worked at Herring Ventures because TUPSS "controls every aspect of its stores' business, including their provision of notary services." Am. Compl. [14] at 19-27.

B.    Discovery Dispute

This discovery dispute concerns subpoenaing for documents and deposing investors in Madison Timber, both individuals and entities, including those who had no active investments at the time Madison Timber collapsed, those who contributed more money than they regained (net losers), and those who regained more money than they contributed (net winners). Lists were provided for in camera review showing names of Madison Timber investors and accountings regarding the money they invested and regained. TUPSS provided a proposed investor subpoena and questionnaire in the consolidated discovery proceeding. Exs. to TUPSS's Notices [79-2] [79-3], *In re Consolidated Discovery*, 3:22-cv-36-CWR-FKB (S.D. Miss. Feb. 28, 2022).

TUPSS initially argues that Receiver cannot advance the claims she alleges because she stands in the shoes of Adams and Madison Timber, not the investors. TUPSS's Mem. [353] at 12, 15-16, 19, 22. That is a dispositive issue that is not addressed in this discovery Order. Only addressed are TUPSS's alternative arguments for why its proposed investor discovery is proper, should Receiver be allowed to advance her claims.

TUPSS asserts that it "has a right to serve subpoenas for documents on investors, and then determine what additional subpoenas for documents and depositions to serve after having had the opportunity to review the documents produced." TUPSS's Mem. [353] at 28. TUPSS submits that Magistrate Judge Ball previously addressed its proposed investor subpoena, and "having reviewed the document requests in the subject subpoenas, . . . f[ound] that they [we]re relevant, at a minimum, to defenses asserted by TUPSS in this case." Order [320] at 2. "Further, the Court f[ound] that the requests [we]re proportional to the needs of this case and that they [we]re not overly broad, except for Request No. 13." *Id.* at 2-3. TUPSS highlights that that Receiver only objected to a small portion of Magistrate Judge Ball's ruling, the portion allowing discovery of Receiver's communications with investors after she was appointed Receiver. Receiver's Mot. for Review [323] at 2 ("Receiver's objection to the magistrate judge's order is narrow."). TUPSS urges that Magistrate Judge Ball's Order settles what Receiver did not challenge, meaning TUPSS's document requests are relevant and proportional. TUPSS's Mem. [353] at 28.

TUPSS next argues that the proposed investor discovery is necessary because each of Receiver's claims "requires proof of reliance and/or proximate causation." TUPSS's Reply [366] at 10. TUPSS asserts that the proposed investor discovery is relevant to the conspiracy and aiding and abetting claims because Receiver must prove the underlying tort of fraud to prevail, meaning Receiver must prove each element of fraud, including reasonable or justifiable reliance by the investors. TUPSS's Mem. [353] at 16-17; TUPSS's Reply [366] at 10-11. TUPSS maintains that the proposed investor discovery is relevant to the conspiracy and aiding and abetting claims because Receiver must establish that the investors' reliance on notarized deeds was the proximate cause of the investors' damages, which means TUPSS needs evidence from investors about whether they "saw, reviewed or cared about those notarizations." TUPSS's Mem. [353] at 17-18, 20-21. TUPSS asserts that one way it can "disprove proximate causation is to show that the investors knew or should have known the investments were fraudulent." *Id.* at 21.

TUPSS argues that the proposed investor discovery is relevant to the "recklessness, gross negligence, and at a minimum negligence" claim because "proximate cause is a hornbook element of a negligence claim, as is comparative fault." TUPSS's Reply [366] at 11. TUPSS submits that the jury will be required "to consider whether any investor was negligent, whether that negligence caused harm, whether any other non-party or defendant was negligent, and then apportion fault among each negligent non-party and other defendants." TUPSS's Mem. [353] at 26. TUPSS emphasizes that Receiver has "acknowledge[d] that for negligent, as opposed

to willful, acts, a defendant is entitled to apportion fault." Receiver's Resp. [288] at

11. TUPSS highlights Receiver's "admission that she intends to call some investors

to testify at trial." *Id.* at 27. TUPSS emphasizes that Receiver is alleging the Notary

Defendants are jointly and severally liable for $100 million dollars, the amount

Receiver claims is the full extent of damages from the Ponzi scheme, even though

some investors did not receive a timber deed acknowledged by a notary who worked

at Herring Ventures. TUPSS's Mem. [353] at 28; TUPSS's Reply [366] at 6.

> Receiver's Response provides:
>
> To be clear: The question is not whether UPS may depose victims the Receiver might call as witnesses at trial (of course it may). The question is whether UPS is entitled to issue subpoenas for documents and to depose each and every victim of Madison Timber, plus other individuals whom they then determine might be relevant *after* they receive documents and take testimony from victims. In other words, the question is whether UPS is entitled to wholesale victim discovery. There is nothing proportional about it.

Receiver's Resp. [362] at 2.

Receiver represents that there is no precedent for the discovery TUPSS seeks,

"and in fact precedent forecloses the discovery UPS seeks." Receiver's Resp. [362] at

7. In support of this representation, Receiver cites her "many hours reviewing the

dockets of the [R. Allen] Stanford [Ponzi Scheme] receivers aiding and abetting cases"

and the following opinions: *Rotstain v. Trustmark Nat'l Bank*, 3:09-cv-2384-N-BQ,

2020 WL 12968652 (N.D. Tex. Feb. 27, 2020); *Ciuffitelli v. Deloitte & Touche LLP*,

3:16-cv-00580-AC, 2018 WL 7893052 (D. Or. Dec. 10, 2018); and *Levinson v. Westport

Nat'l Bank*, 2011 WL 13237887 (D. Conn. May 10, 2011).

8

Receiver claims that she does not have to prove investor reliance to prove that an individual notary breached a "legal duty by attesting to the identity of either a signatory who does not appear before her, or a signatory whom she has not properly identified." Receiver's Resp. [362] at 11. Receiver submits that "[a] notarial document is self-evidencing and authenticating," and "[r]eliance by the reader, including those with no relationship to the notary or signatory, is presumed as a matter of law." *Id.* According to Receiver, "the law governing notarial instruments does not entitle [TUPSS] to depose each and every victim to inquire whether they subjectively relied upon the notarial attestations of fraudulent timber deeds." *Id.* at 12.

Receiver has provided Madison Timber's QuickBooks files, bank statements, promissory notes to investors, and Receiver's accountings of the investors' losses. *Id.* at 16. Receiver argues that TUPSS "has everything it needs to calculate, for itself, Madison Timber's additional liability to investors," and information from investors to account for their losses is cumulative. *Id.* at 17. Receiver acknowledges that at one time she "agreed that written questions, subject to the proper procedure, could be a good tool for obtaining information," but submits that Defendants did not respond to her objections to their proposed questionnaire and insist on unreasonable "wholesale victim discovery." *Id.* at 2. Receiver objects to TUPSS's proposed subpoena's questionnaire as procedurally improper, submitting that TUPSS "must comply with Rule 31, which allows for deposition by written question to any party, but limits such depositions to ten in number absent stipulation or court order." Receiver's Resp. [125]

at 22 (citing Fed. R. Civ. P. 31(a)(2)), *Mills v. Baker Donelson,* 3:18-cv-866-CWR-BWR

(S.D. Miss. Dec. 5, 2023).

## II.  DISCUSSION

A.    <u>Discovery Standards</u>

Federal Rule of Civil Procedure 26(b)(1) provides that

> [p]arties may obtain discovery regarding any nonprivileged matter that
> is relevant to any party's claim or defense and proportional to the needs
> of the case, considering the importance of the issues at stake in the
> action, the amount in controversy, the parties' relative access to relevant
> information, the parties' resources, the importance of the discovery in
> resolving the issues, and whether the burden or expense of the proposed
> discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

Among the limitations Rule 26(b) provides is the direction that the Court must

limit the extent of discovery if it determines that the discovery sought is irrelevant or

"unreasonably cumulative or duplicative, or can be obtained from some other source

that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P.

26(b)(2)(C)(i) and (iii). Rule 26(c) provides that "[t]he court may for good cause, issue

an order to protect a party or person from annoyance, embarrassment, oppression, or

undue burden or expense" by, for example, "forbidding the disclosure or discovery,"

or "forbidding inquiry into certain matters, or limiting the scope of disclosure or

discovery to certain matters."  Fed. R. Civ. P. 26(c)(1)(A) and (D). The party seeking

a protective order has the burden to show the necessity of the issuance of a protective

order, which contemplates a particular and specific demonstration of facts as

distinguished from stereotyped and conclusory statements. *In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998).

B.   Analysis

This discovery dispute is not about whether investors have discoverable information. Receiver concedes that investors have discoverable information by acknowledging that she intends to call some investors at trial. Receiver asserts that "of course" TUPSS may depose certain investors who Receiver might call at trial but then does not identify the investors that she might call at trial. Receiver's Resp. [362] at 2, 18. At this stage of the case, withholding the names of witnesses with discoverable information that the disclosing party may use to support its claims or defenses, and the subject matter of the discoverable information, is not justified or harmless and defies the rule that a party has an ongoing obligation to supplement initial disclosures. Fed. R. Civ. P. 26(a)(1)(A)(i), (e)(1)(B). That Receiver has not yet identified her potential investor witnesses and the subject matter of each's discoverable information sours Receiver's arguments opposing TUPSS's proposed investor discovery.

Through opposing TUPSS's proposed investor discovery, Receiver seeks to limit the (1) number of investors to be subpoenaed and deposed and (2) information that the investors are required to provide. Receiver does not suggest a number that is the correct number of investors to be subpoenaed and deposed but simply refuses the position that TUPSS can subpoena and depose all investors. Over two and half years ago, Receiver suggested permit[ting] the parties to conduct up to 100 [investor]

11

depositions." Receiver's Ex. [109-4] at 2, *Mills v. Baker Donelson,* 3:18-cv-866-CWR-FKB (S.D. Miss. Dec. 6, 2021). Receiver has not made a "particular and specific demonstration of fact" explaining why fewer than all investors should be deposed, and it is her burden to show the necessity of a protective order. Receiver is attempting to collect damages to distribute to all investor victims, not just 100. The Court does not know how many investors assigned their claims to Receiver. A party cannot "refuse discovery simply by making a boilerplate objection that it is not proportional." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.

The relevancy objection running throughout Receiver's opposition to the proposed investor discovery is that Defendants should not be able to litigate whether the alleged $100 million in damages should be reduced or precluded because some of the investors lacked reasonable reliance or good faith. Receiver's Resp. [362] at 17. To the extent Receiver alleges that investor fault is irrelevant, that argument is rejected because it has already been determined that comparative fault may apply. In *Mills v. BankPlus* the Court stated that "principles of comparative fault might warrant a line on the verdict form asking whether Madison Timber, or perhaps investor-victims, bear some percentage of responsibility for the losses shown by the evidence." Order [221] at 1, 3:19-cv-196-CWR-FKB (Jan. 17, 2023). The Court remarked during a motions hearing in *BankPlus* that some investors "might have participated in the fraud because they've been making money off the fraud." Tr. [124] at 12, *Mills v. BankPlus,* 3:19-cv-196-CWR-FKB (June 11, 2021). The Court continued by observing that

this case involves very sophisticated people who engaged in this – who might have -- who had some ability to know that guaranteed premiums is suspect; who might know that timber deeds, you know, if you buy -- if you're investing in land, that there are deeds out there which show that others might know that something is wrong when you get these predated checks and you're told to deposit the check and magically money will appear in your account every month on a specific day.

*Id.* at 13.

Perhaps no investors bear fault, but to the extent Receiver seeks to establish liability based on "recklessness, gross negligence, and at a minimum negligence," alleged fault would be apportioned among all who were negligent.

Receiver's Amended Complaint alleges that "[i]nvestors believed that Madison Timber used investors' money to purchase timber from Mississippi landowners; that Madison Timber sold the timber to Mississippi lumber mills at a higher price; and that Madison Timber repaid investors their principal plus interest with the proceeds of those sales." Am. Compl. [14] at 2. Receiver has alleged what investors believed about Madison Timber, meaning it is fair for TUPSS to explore what investors believed about Madison Timber. Investors can be asked who they communicated with about Madison Timber, regardless of whether that communication was with a current or former Defendant. The Court has observed that why "some people might have participated" in Madison Timber is that they were told by their sister to "get involved," or they told a "brother to get involved, because it is making money." Tr. [124] at 12, *Mills v. BankPlus,* 3:19-cv-196-CWR-LGI (S.D. June 11, 2021). Imposing a blanket order barring Defendants from asking investors about their investment sophistication and potential fault, and only allowing investors to speak about their

13

contacts with Defendants and not others, would provide an incomplete picture of the circumstances surrounding the Ponzi scheme. While Receiver submits that some investors were "of very low sophistication," Tr. [316] at 75, others were in the business of investing; some were incredibly wealthy; some profited and stopped investing in Madison Timber before its collapse; and some, Receiver excluded from distributions. This type of factual context may be needed to resolve disputed dispositive issues because there is no clear, universal law dictating how this case, with these claims and defenses, and a receiver as the only plaintiff, should be tried or how discovery should proceed. Most of Receiver's arguments opposing investor discovery presuppose that her dispositive arguments will prevail.

For example, significant briefing is devoted to the parties' dispute over whether "investor reliance and relatedly, good faith" are relevant to proving or defending against the claims of conspiracy and aiding and abetting. For discovery purposes, if the information is relevant to any claim or defense, it does not matter whether "investor reliance and relatedly, good faith" are relevant to another claim or defense. The type of evidence TUPSS is seeking, whether termed as evidence about investor fault, reliance, or good faith, is relevant at least to Count III for "recklessness, gross negligence, and at a minimum negligence." The claims for conspiracy and aiding and abetting, like the negligence claim, have a proximate cause requirement. The Amended Complaint acknowledges a proximate cause requirement, alleging in the conspiracy and abetting counts that "Defendants' careless and fraudulent notarial acts are a proximate cause of the debts of the Receivership Estate." Am. Compl. [14]

14

at ¶ 85, 95. It cannot be presupposed whether proximate cause for the conspiracy and aiding and abetting claims can be disproven in whole or part by showing that some investors knew about the fraud or should have known about the fraud.

The parties also do not know whether investor fraud and negligence should be considered when calculating damages. Receiver claims that the Receivership Estate is due every penny owed on outstanding promissory notes. Receiver's Resp. [362] at 14-17. Receiver argues that TUPSS cannot look beyond what is owed on the promissory notes because damages "are the debts of the Receivership Estate." *Id.* Receiver cites *Zacarias v. Stanford Int'l Bank, Ltd.*, 945 F.3d 883 (5th Cir. 2019) for this proposition. *Id. Zacarias* does not answer the question of whether TUPSS is prohibited from looking behind what is owed on the promissory notes to attempt to whittle away at Receiver's damages calculations. *Zacarias* addressed pro rata, equitable distribution of receivership assets to defrauded investors versus allowing individual lawsuits that result in "latecomers being left empty-handed." *Zacarias,* 945 F.3d at 895-96. *Zacarias* underscores Receiver's acknowledgment that she "do[es] not represent the investors individually." Tr. [316] at 55. Receiver's duty is to the estate, not the individual investors. *Id.* When investors called Receiver about the subpoenas TUPSS issued to them before those subpoenas were quashed, she informed them that she could not tell them what to do because she is not their lawyer. *Id.* at 54.

Receiver's theory of damages, which would allow investors who knew about the fraud to recover from the Receivership Estate, so long as they had an outstanding

promissory note, has not been tested through a dispositive motion. To ensure that information potentially needed to calculate damages is available at the dispositive motion stage, TUPSS may pursue through investor discovery its theory that the Receivership Estate's damages are at most the principal outstanding to good-faith investors, less amounts subject to clawback from investors or others who knew or should have known that Madison Timber was a Ponzi scheme.

Receiver cites three opinions as examples of "courts refusing the victim discovery that UPS seeks[.]" Receiver's Resp. [362] at 5. The cases relied on by Receiver are *Rotstain v. Trustmark Nat'l Bank*, 3:09-cv-2384-N-BQ, 2020 WL 12968652 (N.D. Tex. Feb. 27, 2020); *Ciuffitelli v. Deloitte & Touche LLP*, 3:16-cv-00580-AC, 2018 WL 7893052 (D. Or. Dec. 10, 2018); and *Levinson v. Westport Nat'l Bank*, 2011 WL 13237887 (D. Conn. May 10, 2011). TUPSS counterargues that Receiver has not cited a case where a receiver alleging aiding and abetting sought "to recover the sums for which those entities were allegedly liable to investors." TUPSS's Mem. [353] at 19-20. None of the three cases cited by Receiver are binding. None address Mississippi law. All have different underlying fact patterns, and none are cases where a receiver was the only plaintiff. Receiver's cited opinions address class actions in the pre-certification stages brought by investors, not a receiver. *Rotstain, Ciuffitelli,* and *Levinson* will be discussed later, but first discussed are two 26(b) factors that favor TUPSS followed by a rejection of the privacy and undue burden objections that Receiver makes on behalf of investors.

16

First, the amount in controversy undermines Receiver's claim that TUPSS is seeking disproportionate discovery. Receiver claims that TUPSS is liable, jointly and severally, for the entire Ponzi scheme. Am. Compl. [14] at ¶¶ 86, 96. Receiver seeks more than $100 million dollars. Receiver's Initial Disclosures [126-2] at 5, *In re Consolidated Discovery,* 3:22-cv-36-CWR-FKB. Receiver seeks punitive damages and attorney fees. Am. Compl. [14] at ¶¶ 87, 97, 110, 121. According to Receiver, "each notary public (and their employer Herring Ventures, and Herring Ventures' franchisor, TUPSS) is liable for the losses of 185 investors – including investors who received timber deeds notarized by notary publics employed by" a former law firm Defendant that settled. TUPSS's Reply [366] at 6.

Second, "the parties relative access to relevant information" favors TUPSS. "In early June 2021, TUPSS served a first tranche of subpoenas for documents on thirty-two (of the approximately 185) Madison Timber investors seeking documents only." *Id.* at 8. To avoid duplicative discovery to investors, the subpoenas were quashed on February 7, 2022, after the Case Management Order in the consolidated discovery proceeding was entered. Order [320] at 3. The Case Management Order limited the initial phase of discovery and required a notice of intent to serve a subpoena on an investor to be filed, and Receiver had fourteen days to move to quash or limit the subpoena. Case Mgmt. Order [7] at 3, *In re Consolidated Discovery,* 3:22-cv-36-CWR-FKB (S.D. Miss. Jan. 31, 2022). Receiver's objections and the parties' inability to reach an agreement about the objections without a Court order have resulted in the issue of investor discovery being stalled since early 2022. TUPSS has been prevented

from proceeding with subpoenaing investors for documents and depositions since then, while Receiver has had the advantage of communicating and obtaining documents directly from the investors for years.

Receiver's assertion of privacy on behalf of investors has already been rejected. On February 7, 2022, Magistrate Judge Ball issued a discovery Order that provided:

> As for the Receiver's argument that some requests in the subpoenas seek private information (specifically, financial, accounting, and tax documents and information), the Receiver has no standing to assert this objection. *Frazier v. RadioShack Corp.*, No. 10-855, 2021 WL 832285, at *1 (M.D. La. Mar. 12, 2012) ("[A] plaintiff cannot challenge a Rule 45 subpoena directed to a third party on the basis that it violates another person's privacy rights . . . ."). The Court notes, however, that the information is relevant and discoverable and that such information may be protected from public disclosure by the subpoenaed investor designating the information as confidential under the protective order already entered by this Court.

Order [320] at 2 n.3.

Magistrate Judge Ball also found – regarding information provided by investors to the FBI, United States Attorney's Office, or other government and investigative agencies – that "[a]lthough certain privileges and protections may apply to those agencies' files, those privileges and protections do not apply to the investors' own documents merely because they may have provided them to those agencies." *Id.* at 1 n.2.

Like objections on privacy grounds, "the issue of whether the burden imposed by compliance with [a] subpoena is properly raised by . . . the third-party required by the subpoena to produce the documents." *Midwest Feeders, Inc. v. Bank of Franklin*, No. 5:14-cv-78-DCB-MTP, 2016 WL 7422560, at *8 (S.D. Miss. May 16, 2016). While

Receiver emphasizes that the investors "are not even parties" and mentions that "the court must be sensitive to the nonparty's compliance costs," [362] at 5, these general statements are not "a particular and specific demonstration of fact, as distinguished from stereotyped and conclusory statements." *In re Terra Int'l, Inc.*, 134 F.3d at 306. The investors due money are unlike traditional nonparties because they have a direct financial interest in the litigation. The investors who assigned their claims to Receiver are also unlike traditional nonparties.

Receiver has provided no affidavits or other evidence to support the assertion of undue burden, and the investment lists submitted suggest that some investors could not credibly claim undue burden. Roughly 100 investors in Madison Timber invested more than one hundred thousand dollars, and seven invested over ten million dollars. One investor allegedly lost over thirteen million in the Ponzi scheme, and eight lost over one million. Some investors responded to the subpoenas for documents issued by TUPSS before the subpoenas were quashed. Order [320] at 2. TUPSS's counsel averred then that they "ha[d] been contacted by several of the Investors or their counsel and none of them . . . raised any objection to producing the requested documents." TUPSS's Resp. [224] at 1. That some investors were responsive before indicates that some may be now.

Next discussed are the opinions in *Rotstain, Ciuffitelli,* and *Levinson*. Receiver cites *Rotstain*, which addressed a complaint brought by The Official Stanford Investors Committee (OSIC) against a bank to recover alleged fraudulent transfers made to the bank and damages for the bank's alleged aiding and abetting in the

diversion of billions of dollars from unsuspecting investors in a Ponzi scheme involving Stanford International Bank, Limited (SIBL). Am. Intervenor Compl. [403] at 2, *Rotstain v. Trustmark Nat'l Bank*, 3:09-cv-2384-N-BQ (N.D. Tex. Nov. 4, 2016). OSIC advanced claims for avoidance and recovery of fraudulent transfers, aiding abetting or participating in fraud, aiding abetting or participating in a fraudulent scheme, aiding abetting or participating in conversion, civil conspiracy, aiding abetting or participating in violation of the Texas Securities Act, and aiding abetting or participating in breach of fiduciary duty. *Id.* at 23-32.

Receiver cites *Rotstain* for the proposition that questioning a Madison Timber investor about the (1) decision to invest in Madison Timber, (2) losses in Madison Timber, (3) Madison-Timber-related investment experience, and (4) awareness of any supposed "red flags" that Madison Timber was a Ponzi scheme has no bearing on whether TUPSS aided and abetted Adams because what is relevant to aiding and abetting is TUPSS's relationship with Adams. Receiver's Resp. [362] at 4. In *Rotstain,* OSIC sought to quash the deposition of an investor who was also an OSIC member. *Rostain,* 2020 WL 12968652 at 1. The magistrate judge agreed with OSIC that the investor's "personal investment encounters with the Stanford scheme 'have no bearing on' the disputed matters raised by the parties' pleadings herein, e.g., *TD Bank's relationship* with Stanford, whether and why it served as SIBL's main U.S. dollar correspondent bank, and whether it 'knew or had general awareness that Allen Stanford was causing his entities to violate securities law . . . or committing fraud.'" *Id.* at *7 (emphasis in original).

20

What Receiver does not mention is that there was no negligence claim in *Rotstain,* and the investor at issue in *Rotstain* had "been deposed twice, where parties examined her at length about her and her late husband's CD investments with Stanford, the reasons why they made the investments, and her trip to Antigua etc." *Id.* (internal quotations omitted). This is the same type of information that TUPSS seeks, and TUPSS is requesting a first deposition, not a third, in a case with a negligence claim. The magistrate judge in *Rotstain* prevented "additional testimony" from the investor about her and her husband's personal decision to invest in the Ponzi scheme. *Id.* at 8. *Rotstain* addressed a putative class action in the precertification stage, and *Rotstain* was never tried. Am. Intervenor Compl. [403] at ¶ 14, *Rotstain v. Trustmark Nat'l Bank*, 3:09-cv-2384-N-BQ (N.D. Tex. Nov. 4, 2016); *Rotstain v. Trustmark Nat'l Bank*, 4:22-cv-800 (S.D. Tex. dismissed May 31, 2024).

Like *Rotstain,* Receiver cites *Ciuffitelli* for the proposition that investors' personal communications have no bearing on Defendants' own relationship with Adams. Receiver's Resp. [362] at 4-5. *Ciuffitelli* also addressed a putative class action in the pre-certification stages that ultimately settled before trial. 2018 WL 7893052, at *1. The investors in *Ciuffitelli* sued to recover losses on securities they purchased from Aequitas Capital Management entities. *Id.* The suit alleged that Aequitas securities were sold in violation of Oregon securities law because they were not registered and were sold by means of untrue statements or omission of material facts. *Id.* at *1-2. Violation of Oregon securities law was the only cause of action. Compl. [257] at 160, 3:16-cv-580-AC (D. Or. Sept. 8, 2017).

21

Aequitas investors sued Deloitte & Touche, LLP (Deloitte), who performed auditing and accounting services for Aequitas, alleging that Deloitte participated or materially aided in the sales of Aequitas securities. Deloitte moved to compel the investors to produce "documents pertaining to Plaintiffs' financial condition," including tax returns, investment statements, bank statements, and other account statements showing income, assets, and liabilities. *Ciuffitelli,* 2018 WL 7893052, at *1-2. Deloitte argued in part that "Plaintiffs' financial condition and investment experience is relevant to Plaintiffs' knowledge and understanding of the risks of their investments." *Id.* at *3. The plaintiffs counterargued that financial condition documents were "not relevant whatsoever to whether they knew of any untrue statements or omissions relating to Aequitas and Aequitas's financial condition. *Id.* at *3. The plaintiffs also argued that financial condition documents did "not bear on any issue pertaining to class certification because the affirmative defenses of unclean hand[s] and *in pari delicto* posited by Deloitte [were] not available under Oregon Securities law." *Id.*

Deloitte's motion to compel the investors to provide financial condition documents was denied. *Id.* The motion to compel was denied primarily because the plaintiffs' status as accredited investors was not in dispute and because "under ORS § 59.115(1)(b), only a purchaser's actual knowledge of a misrepresentation [was] relevant, and the statute provide[d] for strict liability for nonsellers who participate and materially aid the sale." *Id.* The *Ciuffitelli* court observed that Deloitte failed to show that what it argued was "distinct from comparative negligence," and Deloitte

"ha[d] not established that under Oregon law any equitable defenses are available as part of the statute's design or purpose." *Id.* at *4. *Ciuffitelli* was not a comparative negligence case, and Receiver is not proceeding under a strict liability statute like Oregon Revised Statute § 59.115(1)(b).

Receiver cites *Levinson*, also an opinion addressing a class action in the precertification stage, for the proposition that TUPSS is not entitled to individualized investor discovery regarding whether investors in Madison Timber saw "red flags" that Madison Timber might be a fraud. Receiver's Resp. [362] at 6. Receiver posits that the *Levinson* court "reject[ed] the same arguments UPS makes here." *Id.* Receiver highlights the following sentence from *Levinson*: "WNB's suggestion that Thomas Ridzon's knowledge of BLMIS is commensurate with its own because he obtained two out of the dozens of monthly account statements given to WNB is far-fetched." *Id.* (citing *Levinson,* 2011 WL 13237887, at *3).

*Levinson* did not reject TUPSS's argument about comparative negligence because *Levinson* mentions the words "proximate cause and comparative negligence" once and only then as part of reciting the bank defendant's allegations. *Levinson,* 2011 WL 13237887, at *2. The *Levinson* court based its discovery ruling on whether the financial condition documents sought were relevant to disprove superior knowledge, a concept pertinent to the breach of fiduciary duty claim. *Id.* at 2-3. *Levinson* alternatively denied the motion to compel on grounds that disproving superior knowledge was "not addressed to class-wide liability issues." *Id.* For reasons that cannot be discerned from the opinion, *Levinson* did not address the bank's recited

23

argument that "red flags" evidence was relevant to issues of proximate cause and comparative negligence. Thus, *Levinson* is not instructive about whether "red flags" evidence is appropriate here.

*Newman v. Mayer Brown, LLP*, 252 So. 3d 755 (Fla. Dist. Ct. App. 2018) was offered by Baker Donelson in *Mills v. Baker Donelson,* 3:18-cv-866-CWR-BWR, as instructive on the issue of investor discovery. *Mayer Brown* resembles this case more than *Rotstain, Ciuffitelli,* and *Levinson*. In *Mayer Brown,* a receiver sued a law firm alleging that the law firm was guilty of (1) professional malpractice; (2) aiding and abetting breaches of fiduciary duty; (3) aiding and abetting fraud; (4) aiding and abetting breaches of statutory duties; (5) negligent misrepresentation; and (6) fraud. *Mayer Brown*, 252 So. 3d at 756 n.4. The receiver represented "thirty-eight investor entities and individuals" who had assigned their claims to the receiver. *Id.* at 756. The law firm defendant moved to compel the receiver to produce documents on behalf of the investors and comply with investor deposition requests. *Id.* at 757. The trial court granted the law firm's motion to compel. *Id.* The receiver filed a petition for writ of certiorari, arguing that the trial court erred in compelling discovery because the investors were nonparties and could not take part in discovery without a subpoena. *Id.*

The Florida appellate court denied the receiver's petition for certiorari, holding that "because assignors retained substantial, financial interests in their assigned claims, they could be treated as de facto parties for purposes of discovery." *Id.* at 758. The Florida appellate court recognized that "it would be patently unfair to allow

assignors to use the assignment contract as both a shield and a sword, allowing them on one hand to evade good faith discovery requests by adverse parties, and on the other ultimately reap the benefits of any damages awarded to them by way of their assigned actions." *Id.* at 758. *Mayer Brown* is not instructive regarding the breadth of information sought from each investor because it does not reveal the specific information requested from the investors, but *Mayer Brown* muddies Receiver's position about individualized investor discovery in an aiding and abetting case. *Mayer Brown* also raises the issue of whether Receiver's obtainment of assignments from investors brings associated discovery responsibilities. In *Baker Donelson,* Receiver did not respond to Baker Donelson's reliance on *Mayer Brown.*

Receiver claims that TUPSS's focus on her negligence claims "does not solve the problem that the Stanford receiver's aiding and abetting cases present, because many of those cases included negligence claims, too." Receiver's Mem. [362] at 4. Receiver then drops a footnote to support that statement which provides in full:

> *See, e.g.*, Doc. 287 at 96, Plaintiffs' Second Amended Complaint, *Janvey v. Greenberg Traurig*, No. 3:12-cv-4641 (N.D. Tex.) ("RECEIVER CLAIMS … Negligence"); Doc. 302 at 100, Plaintiffs' First Amended Complaint, *Janvey v. Proskauer Rose*, No. 3:13-cv-477 (N.D. Tex.) ("COUNT 1: Negligence"); Doc. 7 at 56, Plaintiffs' First Amended Complaint, *Janvey v. Willis of Colorado*, No. 3:13-cv-3980 (N.D. Tex.) ("Negligence"); Doc. 30 at 42, *OSIC [as assignee of the Stanford receiver's claims] v. BDO USA*, No. 3:12-cv-1447 ("COUNT 1: Negligence/Gross Negligence").

*Id.* at n.9.

Receiver is urging a conclusion based on lack of evidence rather than actual evidence, which is unreliable logic. There may be other plausible reasons why the

defendants in these four cases did not pursue individualized investor discovery. The dockets of these cases show that discovery was scarcely addressed, and the cases settled before they were tried.

The Court already remarked in *BankPlus* that "[i]n discovery as in everything else, the particulars are instructive." Order [221] at 1, 3:19-cv-196-CWR-FKB (Jan. 17, 2023). Applying Rule 26 to these claims and defenses and this fact pattern, Receiver's relevancy objections are overruled, and her disproportionality arguments severely undermined by (1) the amount in controversy, (2) TUPSS's inability for years to obtain investor discovery while Receiver has had it, and (3) Receiver's failure to reveal, years into the case, who her potential investor witnesses are and the subject matter of each's testimony.

The proportionality of investor discovery will be managed by deposing investors in groups. It will not be determined now that all investors cannot be subpoenaed or deposed. There will be a discovery conference to proceed with choosing the first group of investors to be deposed, and proportionality will be further discussed through finalizing the terms of a subpoena to investors, and addressing Receiver's objection to a questionnaire, if any. Previously, Receiver indicated that a questionnaire "could be very productive" in determining "the basics underlying an investor's relationship to Madison Timber." Tr. [100-1] at 43, *In re Consolidated Discovery,* 3:22-cv-36-CWR-BWR (S.D. Miss. Dec. 7, 2021). TUPSS should be prepared to address at the discovery conference whether already having Madison Timber's QuickBooks files, bank statements, checks, and wire logs, means some of

their requests to investors are unreasonably cumulative, duplicative, or overbroad. TUPSS should be prepared to support its position that the amount of detail and documents requested from investors is proportional to the needs of the case. Receiver should be prepared to discuss the assignments that she obtained from investors.

### III.  CONCLUSION

**IT IS THEREFORE ORDERED** that TUPSS's Motion to Conduct Investor Discovery [352] is **GRANTED**.

**IT IS FURTHER ORDERED** that **October 11, 2024** is the deadline for all parties to supplement their initial disclosures in the detail and manner dictated by Federal Rule of Civil Procedure 26(a)(1) and (e).

**SO ORDERED** this 27th day of September 2024.

s/ *Bradley W. Rath*

BRADLEY W. RATH
UNITED STATES MAGISTRATE JUDGE